UNITED STATES *v.* FORD.

*(District Court, W. D. North Carolina. December Term, 1887.)*

1. RESCUE—OF GOODS UNDER SEIZURE—INDICTMENT.
   On an indictment for attempt to rescue goods under seizure it appeared that defendant, on arriving at the place soon after the officers had obtained possession, sprang from his wagon in a violent manner, and, with abusive terms, threatened to get his gun from the adjoining house and shoot the officers, who only prevented him from accomplishing his purpose with much difficulty, and after an obstinate resistance. *Held,* that if this conduct was the result of a sudden impulse of passion, excited by a supposed injury inflicted by the officers upon defendant's mother, a conviction would not be warranted; but that although defendant afterwards stated that he acted under such impression, and helped the officers in placing the goods upon his wagon, agreeing that it might be used for bearing them away, the jury could consider his subsequent attempt to prevent its removal by threats and violent conduct, as showing his original purpose, and a connection between all his transactions.

2. WITNESS—CREDIBILITY—FORMER TESTIMONY.
   A contradiction between the testimony given by a witness at the trial and that given before the commissioner upon a preliminary examination, tends to lessen its credibility; but where the commissioner testifies that he did not give a complete report of the evidence, and the testimony was not so full as at the trial, an omission from the examination of testimony given at the trial may be attributed to the incompleteness of the report.

3. SAME—CREDIBILITY—INTEREST.
   The testimony of near relatives in behalf of a defendant charged with crime is to be weighed with great caution.

Indictment for an Attempt to Rescue Property under Seizure.

*H. C. Jones,* U. S. Atty., and *G. F. Bason,* Asst. U. S. Atty., for the United States.

*D. A. Covington* and *F. I. Osborne,* for defendant.

DICK, J., *(charging jury.)* I regret that you have been detained so late in the evening after such faithful and patient services during the day; but the case on trial is an important one to the government, to the community, and to the defendant, and requires full investigation. No more time than was necessary has been occupied in the examination of the witnesses, and in the argument of counsel, and I feel sure that you will carefully consider the testimony and the instructions of the court, and then render an impartial verdict.

It appears from the testimony of the deputy collectors Means and Vanderford that they went to the house of Mrs. Martha Ford for the purpose of making search for illicit spirits which, from reliable information, they believed were concealed on her premises. They had in their hands a search-warrant, duly issued by a commissioner of the circuit court, authorizing and directing Deputy Collector Means to search the premises of William Ford for spirituous liquors on which the tax had not been paid. William Ford resided with his mother, Martha Ford, and had the possession and control of a small house on the premises. There was a bar-room sign over the door, and the deputy collectors had seen William

Ford come out of this house in company with a stranger, who had a bottle in his hand, and they felt confident that illicit spirits were therein concealed. They informed William and his mother that they had a search-warrant, and wished to have the house opened for their examination. From the time they went on the premises they met with opposition and hinderance, from members of the family, until they left, in the afternoon, with the spirits which they had lawfully seized. They were there rightfully; they were in the performance of their legal duty; they were invested with official authority to seize untax-paid spirits; and they were also acting under due process of law. They were under the special protection of the law while thus obeying its mandates. The search-warrant authorized them to search the small bar-room on the road near the dwelling, and to break open the door if they could not obtain an entrance by other less forcible means. They respectfully asked for the key, but their request was denied by William, and Mrs. Ford placed herself in front of the door to prevent its being broken. William then called his brother Mac Ford, who soon came, and, at his suggestion, the door was opened, and several packages of unstamped spirits were found in the house, and were duly seized by the deputy collectors. In a short time after the seizure the defendant, George Ford, returned from a neighboring mill with his wagon and team, and, upon being informed of the seizure, he sprang out of his wagon, and in a very violent manner, and with abusive terms, threatened to get his gun from the dwelling-house and shoot the officers, who, with much difficulty, and after obstinate resistance, prevented George and William from reaching the house to obtain weapons to carry out their threats of violence.

Resistance to officers acting under legal authority is a crime at common law, and, by statute, is made an offense against the United States. But this is not the charge against the defendant in this case. The section of the Revised Statutes upon which this indictment is founded relates to offenses that tend to prevent revenue officers from discharging their proper duties. This section, in disjunctive clauses, designates several offenses, of a kindred nature, and some of them so closely resemble each other that they cannot be clearly distinguished. The conduct of William Ford, in refusing admittance to the room when he had the key, may be regarded as hindering, and the conduct of Mrs. Ford as obstructing, the officers in the performance of legal duty; and, if such acts were forcible, would subject the parties to indictment. Forcible obstruction or hinderance does not necessarily mean actual violence to the person of an officer. Threatening language, or conduct calculated and intended to intimidate prudent, cautious, and ordinarily brave men, and make them desist from the performance of official duty from well-grounded apprehension of serious personal harm, is forcible conduct, in contemplation of law, although unsuccessful in its aim and purpose. A person can apply opprobious epithets to officers, and use language of vehement denunciation, but if he does not, by acts or words, manifest a present purpose of personal violence and injury, he is not guilty of forcible obstruction or hinderance of legal authority. At common law search-warrants were only

allowable for the discovery of stolen goods, and they were limited by rules of law of more than ordinary strictness. They were regarded as instruments of arbitrary power, obnoxious in principle, and odious in execution, as they authorized an invasion of the privacy and security of the home. Our state and national constitutions have provisions to guard against unreasonable searches and seizures, and public sentiment is adverse to such proceedings, unless prudently executed in accordance with the strict requirements of the law. A statute of the United States authorizes such warrants to be issued to revenue officers, to discover and prevent frauds upon the revenue, and such proceedings are extremely odious to many of our people. Even in their prudent execution they are well calculated to provoke abusive language. Such language may be untrue and unjust in a moral point of view, but is not criminal unless it be of such a character as to be calculated to intimidate officers, and make them desist from the performance of imperative duty. It is essential that there should be some unlawful effort, either by direct acts, or by some movement or language, showing a present intent to accomplish the unlawful purpose.

The defendant might have been indicted in different counts for obstruction and hinderance, although he did not reach the premises until after the seizure was made, as the officers were in the performance of legal duty until the property seized was carried away and disposed of, in accordance with the requirements of law. There is but one charge in this bill,—that of an attempt to rescue the property seized. The offense of rescuing property consists in the forcible retaking of property out of the hands of officers of the law who have it in legal custody. An attempt to rescue is a forcible, but unsuccessful, effort to accomplish a rescue. I have already informed you that a forcible effort, in contemplation of law, does not necessarily require actual violence to be committed against an officer. In this case there was no actual injury perpetrated against the officers; and the question which you have to determine is whether the language and conduct of the defendant was, under all the circumstances, intended and well calculated to intimidate the officers, and prevent them from carrying off the unstamped spirits which had been legally seized, so that by due proceedings they might be condemned as forfeited to the government. It is insisted, on the part of the defendant, that his conduct and language, at the time when he sprang out of his wagon at the bar-room door, were not caused by anger aroused by the seizure of the spirits, but by the information that he had previously received from his mother that she had been injured by the willful acts of one of the officers. If you believe, from the evidence, that his violent conduct and threats were the result of a sudden impulse of passion excited by the supposed insult and wrongful injury to his mother, then they would not be sufficient evidence to warrant a conviction of the defendant.

The evidence tends to show that Mrs. Ford received the injury from her son William while attempting to prevent the officers from discharging their official duty, and that the defendant had had no communication from his mother when he made the threats of shooting the officers.

You have heard the conflicting evidence upon this matter, and can determine as to credibility. The evidence shows that the defendant afterwards said to the officers that he had acted hastily, and solely under the impression that they had injured his mother; but since he had heard the facts about the matter he was satisfied, and "all is right;" and agreed that his wagon and team might be used to haul off the spirits, and he helped in placing the spirits in the wagon.

The district attorney, in his argument, insisted that if the evidence as to the conduct and threats of the defendant up to this period of the transaction was insufficient to show a willful purpose to intimidate the officers, and prevent the removal of the spirits, his subsequent conduct and language manifested his original spirit and purpose of violence, and clearly showed the insincerity of his pretended reconciliation with the officers about the supposed injury to his mother. This point is well made, and you can consider the evidence as tending to show a connection between all of the transactions of the defendant. The evidence tends to show that when the wagon was loaded, and the officers were making preparations to leave the premises, the defendant said, with an oath, to the driver, a colored man, who was his servant: "Stand by me. I am as good a man as there is on the bill, and the whisky shall not be removed." Threats were required from the officer to make the colored man proceed. The defendant in the mean time had obtained a pistol from the house, and he pointed the same at the officer Vanderford as he was leaving, and when he saw that the officer had observed the movement he "fired off" the pistol in a different direction. The witnesses for the prosecution also testified that when they had passed down the road some distance from the house they saw the defendant and his brother William with something like a gun, walking rapidly in a direction to get ahead of them on the road which they were going. The evidence further shows that Mac Ford, a brother of defendant, was in a buggy with Deputy Collector Means, who said: "If those men shoot at me, I will not waste any shots in the woods, but will use them on you." Whereupon Mac Ford spoke in a loud voice to his brothers: "You fools, you are preparing to get me shot." The officers saw no more of the defendant and his brother William. Many of the material statements of the officers were contradicted by the testimony of the defendant, of Mrs. Ford, and of Mac Ford, and you must carefully consider the conflicting evidence, and determine which version of the transaction is worthy of belief.

The counsel of the defendant, in their arguments, insisted that the reliability of the testimony of the officers was diminished by the fact that it did not correspond, in many material points, with their testimony before the commissioner of the circuit court on the preliminary examination. The commissioner testified that his statement of the evidence on the preliminary hearing was vague and incomplete, as he did not attempt a *verbatim* report; that the testimony of the officers before him was not as full in all particulars as their testimony on this trial, but, when on the same points, was substantially the same. On this matter I

charge you that it is not reasonable to suppose that the testimony of witnesses will be as full and explicit on a preliminary examination as it will be in a court, before a jury, where able, experienced, and skillful lawyers conduct the examination. The incomplete report of what the the commissioner deemed material cannot be regarded as a full statement of all that was said before him, although signed by the witnesses. When there is contradiction in the testimony of a witness on a preliminary hearing and that on a trial in court, such matter tends to lessen its credibility; but when there is an omission of testimony, this may be attributed to the incompleteness of the report of the commissioner. The testimony as to the character of the witnesses on both sides shows that they are all persons of good character. You must reconcile apparent conflicts, if you can; and, in determining the weight of testimony, you must consider all the circumstances of the transaction, in connection with the motives and relations of the parties, and their conduct on the witness stand.

On the instructions requested by the district attorney I charge you that the testimony of near relatives in behalf of a defendant charged with crime is to be weighed with great caution, as they are usually prompted by feelings of natural affection, and may reasonably be regarded as strongly biased in favor of a kinsman, whose character and liberty are in jeopardy. The testimony of a defendant in his own behalf may well be supposed to be influenced by strong motives of interest and self-protection. The officers were in the discharge of their duties; they had just grounds for the seizure; they acted with much forbearance and prudence; and there is no evidence that they had any feelings of unkindness towards the defendant.

If you become satisfied, beyond a reasonable doubt, that the charge in the bill of indictment is sustained by the evidence, return a verdict of guilty; if not so satisfied, then return a verdict of not guilty.